WILSON TURNER KOSMO LLP
CLAUDETTE G. WILSON (110076)
MERYL C. MANEKER (188342)
KATHERINE P. POTHIER (171783)
LISA A. HILL (223995)
550 West C Street, Suite 1050
San Diego, California  92101
Telephone:  (619) 236-9600
Facsimile:  (619) 236-9669
E-mail:  cwilson@wilsonturnerkosmo.com
E-mail:  mmaneker@wilsonturnerkosmo.com
E-mail:  kpothier@wilsonturnerkosmo.com
E-mail:  lhill@wilsonturnerkosmo.com

Attorneys for Defendant
TARGET CORPORATION

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANYELL MURPHY and CANDI PERRY individually and on behalf of all others similarly situated, | Case No. 09cv1436-CAB (WMC) |
|           Plaintiff, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT TARGET CORPORATION'S MOTION OR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, A DETERMINATION OF FACTS NOT GENUINELY IN DISPUTE; APPLICATION FOR EXEMPTION FROM WAGE ORDER** |
|       v. | |
| TARGET CORPORATION, and DOES 1 through 50, inclusive, | |
|           Defendants. | |
| | **[Fed. R. Civ. P. 56 (c), (g); Wage Order No. 7-2001, Section 17]** |
| | Complaint Filed:    May 19, 2009 |
| | Date:         August 22, 2012<br>Time:         2:00 p.m. |
| | **ORAL ARGUMENT REQUESTED SUBJECT TO COURT APPROVAL** |
| | District Judge:    Cathy Ann<br>                 Bencivengo<br>Courtroom:     2 |
| | Magistrate Judge:  William McCurine, Jr.<br>Courtroom:     C |
| | Trial Date:       Not Set |

# **TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................................1

II.     STATEMENT OF FACTS .......................................................................................3

 A.      The Duties of a Target Cashier Require Standing ...................................3

  1.      Cashiers Must Scan and Bag Items of All Sizes and Often Must Lift Heavy or Bulky Items or Walk Around the Checkstand to Hand Scan Items ..........................................................4

  2.      Cashiers Are Required to Step Out from Behind Their Checkstand, Wait "In Aisle," and Greet Guests ..............................5

  3.      Cashiers Must Clean, "Zone," and Process Hangers, None of Which Can Be Accomplished While Seated .......................5

 B.      Cashiers Cannot Perform Their Required Duties When Provided Seats ...............7

 C.      Target's Approach to Checkout Is Consistent With the Target Brand, Including a "Fast, Fun and Friendly" Guest Experience ..........................8

 D.      Target's Checkstands are Thoughtfully Designed and Meet OSHA Guidelines ............................................................................................10

 E.      Target's Generous Break Schedule Permits Target Cashiers to Use Seats ..........11

III.    LEGAL ARGUMENT ...........................................................................................12

 A.      Wage Order No. 7-2001, Section 14(A) and (B) ...................................12

  1.      Subsections (A) and (B) Are Mutually Exclusive .....................12

  2.      An Analysis of the "Nature of the Work" Must Necessarily Consider the Entire Job...............................................14

 B.      The "Nature of the Work" of a Target Cashier Requires Standing and/or Does Not Reasonably Permit the Use of a Seat..............................16

  1.      Seated Cashiers Are Inconsistent With Target's "Fast, Fun and Friendly" Guest Service Brand Image ..........................16

  2.      Plaintiffs' Expert Ergonomist Admits the Duties of a Target Cashier Require Standing and Cannot Be Performed Seated and that He Cannot Identify a Feasible Seated Alternative .............................18

   a.      Dr. Johnson Agrees Cashiers Cannot Perform Their Duties Seated Within the Current Checkstand Configuration..................18

   b.      Dr. Johnson Proposes a Hypothetical Checkstand Redesign But Agrees That Even If Implemented, Cashiers Must Stand to Perform Key Duties .......................................19

MEMORANDUM OF POINTS AND AUTHORITIES ISO TARGET'S MOTION FOR SUMMARY JUDGMENT

    c. Dr. Johnson's Hypothetical Checkstand Redesign Is Admittedly Untested and Simply Not Feasible ...........................20

  3. Target's Expert Ergonomist Agrees that Cashiering Cannot Be Done Safely While Seated .........................................................21

 C. Should This Court Decline to Grant Summary Judgment As to the Ultimate Legal Issue, Target Requests the Court Grant It an Exemption From Enforcement, Or, in the Alternative, Establish Certain Facts Are Not Genuinely in Dispute Pursuant to Rule 56(g) ........................................................22

  1. Target is Entitled to an Exemption under Section 17 ...............................22

  2. Alternatively, the Court Should Determine that Certain Facts Are Not Genuinely in Dispute and Are Established in the Case ....................24

IV. CONCLUSION.............................................................................................25

1

## <u>TABLE OF AUTHORITIES</u>

2

**Federal Cases**

*Campbell v. PricewaterhouseCoopers, LLP*,
    642 F.3d 820 (9th Cir. 2011) .......................................................................12, 13

*Currie-White v. Blockbuster, Inc.*,
    2009 U.S.Dist. LEXIS 68438 (N.D.Cal.) ........................................................12

*D'Amica v. City of New York*,
    132 F.3d 145 (2d Cir. 1998).............................................................................17

*Garvey v. KMart Corp.*,
    2012 U.S.Dist. LEXIS 51705 (N.D.Cal) ........................................................12

*Green v. Bank of America*,
    2011 U.S.Dist. LEXIS 152745 (C.D. Cal.)......................................................12

*Jama v. Immigration & Customs Enforcement*,
    543 U.S. 335, 125 S.Ct. 694 (1995).................................................................13

*Kilby v. CVS Pharmacy, Inc.*,
    2012 U.S. Dist. LEXIS 76507 (S.D. Cal. 2012) ..................................... passim

**State Cases**

*Brinker Restaurant Corp. v. Superior Court*,
    53 Cal.4th 1004 (2012) ...................................................................................16

*Morillion v. Royal Packing Co.*,
    22 Cal.4th 575 (2000) .....................................................................................16

*Seymore v. Metson Marine, Inc.*,
    194 Cal.App.4th 361, 369 (2011) ...................................................................16

*Wasatch Prop. Mgmt. v. Degrate*,
    35 Cal.4th 1111 (2005) ...................................................................................15

*Woods v. Young*,
    53 Cal.3d 315 (1991) ......................................................................................15

**State Statutes**

California Government Code section 12926.............................................................17
California Labor Code section 2699 .......................................................4, 23, 24, 25
Labor Code section 512 .........................................................................................11
Labor Code section 1198 .......................................................................................12
Labor Code section 2698 .......................................................................................12

**Rules**

Federal Rule of Civil Procedure 56 .........................................................3, 22, 24, 25

**Regulations**

29 Code of Federal  Regulations 1630.2.................................................................17
California Code of Regulations, Title 8 section 11070.............................................12

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Other Authority**

California Wage Order No. 7-2001 ........................................................................ passim

Webster's II New Riverside University Dictionary.........................................................14

MEMORANDUM OF POINTS AND AUTHORITIES ISO TARGET'S MOTION FOR SUMMARY JUDGMENT

# I.   **INTRODUCTION**

Plaintiffs Danyell Murphy ("Murphy") and Candi Perry ("Perry") ("Plaintiffs"), current and former employees of Defendant Target Corporation ("Target") respectively, contend that Target is violating the law because its Cashiers stand.  Plaintiffs' complaint is premised solely on Section 14(A) of California's Wage Order No. 7-2001, which requires that employees be provided with "suitable seats" where the "nature of the work reasonably permits the use of seats."  However, Section 14(B) of the Wage Order provides a separate and mutually exclusive alternative obligation for employers, namely when the nature of the work requires standing, the employer must provide an adequate number of suitable seats in reasonable proximity to the work area.[1]  This case therefore turns on one pivotal element—the "nature of the work" of a Target Cashier.  The undisputed evidence shows that the "nature of the work" of a Target Cashier: (1) requires standing; and/or (2) does *not* reasonably permit the use of a seat.  As such, summary judgment is appropriate.

To understand Target's obligations one must consider the entire Wage Order, and the only logical interpretation of the Wage Order is that the subsections are mutually exclusive.  Judge Anello's recent decision in *Kilby v. CVS Pharmacy, Inc*., 2012 U.S. Dist. LEXIS 76507 (S.D. Cal. 2012) is instructive on the issues of how: (1) subsections (A) and (B) are to be read together; and (2) the phrase the "nature of the work" is to be analyzed.  First, based on a detailed analysis of the statutory construction, Judge Anello held "[w]hen both subsections are given full and independent effect, Section 14 establishes a dichotomous approach for employers to follow, based on the 'nature of the work' involved.  **The subsections are mutually exclusive**."  *Id*. at *13 (emphasis added).

Second, the Court held the phrase "nature of the work" should be read "holistically;" in other words, to determine whether an employer must comply with subsection (A) or (B), this Court must consider the nature of an employee's job as a whole, "factoring in the myriad duties that an employee may perform during a shift." *Id*. at *9.  And because no one would dispute that a company's expectation of its employees, and its business judgment, plays a role in determining an employee's job and its many duties, "courts should consider an employer's 'business judgment'

---

[1] There is no dispute in this case—and Plaintiffs have not alleged—that seats are not made available to Target Cashiers in compliance with Section 14(B).

MEMORANDUM OF POINTS AND AUTHORITIES ISO TARGET'S MOTION FOR SUMMARY JUDGMENT

when attempting to discern the nature of an employee's work." *Id*. at \*15-16.  Kilby, represented by the same counsel as in the instant matter, argued a contrary position—one that Target anticipates they will also argue in this case: the phrase "nature of the work" should be understood as referring to any individual duty that an employee performs.  Thus, if any discrete task required within the employee's overall job could be performed while seated, then an employer must provide a seat.  Based on fundamental principles of statutory construction, as Judge Anello held, the "nature of the work" cannot be defined in terms of any one of a number of job duties, "because then a single employee could fall under the ambit of both sections during the course of a single shift based on which job duty she was performing at the time." *Id*. at \*13.

The *Kilby* court's decision is consistent with the only guidance provided by the Division of Labor Standards Enforcement ("DLSE") and Industrial Welfare Commission ("IWC") regarding the seating requirement of Section 14(A): namely, the requirement does not apply to salespersons who have to greet customers, and assist customers with purchases.  Moreover, Plaintiffs' expert ergonomist agrees that Target has done a "good job" of complying with the guidelines promulgated by the federal Occupational Safety and Health Administration ("OSHA"), which are the only guidelines that address ways to provide safe workstations for Cashiers.  In fact, Target has gone to great lengths to design safe workstations for its employees and has never been cited by OSHA for any issues related to the operation of its standing checkstand or the performance of the job duties of its front-end Cashiers.  It is clear that the nature of a Target Cashier's work requires standing and does not reasonably permit the use of a seat based on the following undisputed facts:

> 1.      The duties of a Target Cashier require standing as conceded by Plaintiffs' expert ergonomist who, in fact, agrees that within the current checkstand configuration, Target Cashiers should not perform their work seated;
>
> 2.      Target trains and expects its Cashiers to stand in order to present a ready-to-serve image consistent with its "Fast, Fun and Friendly" guest service model;
>
> 3.      In an effort to create an opportunity for Cashiers to sit, Plaintiffs' expert proposes a redesign of Target's checkstands to allow both sitting and standing; however, he acknowledges the proposed design does not exist anywhere in the retail environment, and that even

with the redesign, certain tasks (including scanning and bagging heavy and bulky items) would still need to be done standing; and

4.    Plaintiffs' expert further concedes that he does not know if this hypothetical sit or stand checkstand design will allow Target to fulfill its expectations for Cashier productivity, efficiency, and customer service at checkout.

Given these undisputed facts, the Court should grant summary judgment in favor of Target and dismiss Plaintiffs' First Amended Complaint. Alternatively, Target requests that this Court (a) grant it an exemption from Section 14 of the Wage Order, and/or (b) determine, pursuant to Fed. R. Civ. P. 56(g), that: (1) Target's *current* checkstand configurations do not reasonably permit the use of a seat; (2) Target did not willfully violate Section 14; (3) any violation of Section 14 by Target was inadvertent; (4) enforcement of Section 14 would not materially affect the welfare or comfort of Target Cashiers; and (5) enforcement of Section 14 would work an undue hardship on Target.

## II.    STATEMENT OF FACTS

### A.    The Duties of a Target Cashier Require Standing

A picture is worth a thousand words in understanding what a Target Cashier does on a daily basis. Attached to Target's Notice of Lodgment is a video compilation prepared by Target showing Cashiers at work at multiple stores and across multiple shifts.[2] While Target has a number of checkstand designs at its various stores,[3] regardless of which checkstand model is in place, there is not a single category of duty that should be performed from a seated position.[4] In other words, while

---

[2] Defendant's Notice of Lodgment ("DNOL") Ex. 2; *see also,* Declaration of Katherine K. Pothier, Esq. ¶ 2; Declaration of William Marras ("Marras Decl."), ¶ 4; Deposition of Dr. William Marras ("Marras Depo.), DNOL Ex. 11, pp. 50:10-51:22.

[3] Declaration of Mitchell Knoll ("Knoll Decl."), ¶ 4; *see also*, Cashier and Guest Services Duties at Target Stores in California: Ergonomics & Biomechanics Issues Related to Sitting vs. Standing by William S. Marras, PhD, CPE, The Ohio State University ("Marras Expert Report"), DNOL Ex. 4, pp. 19-24. Dr. Marras' report has been lodged in redacted form pursuant to the Stipulated Protective Order in place. The redacted portions of the report have not been relied on by Target in this motion.

[4] Plaintiffs' expert, Dr. Steven Johnson, identified the "primary tasks" of a Target Cashier as: (1) "receiving items from the conveyor belt;" (2) "scan[ning]the items by moving them across the scanner or with a hand scanner;" (3) bag[ging] the items; (4) "giv[ing] the bags to the customer or put[ting] it on the counter;" (5) "enter[ing] information at the keyboard and scan[ning] credit cards;" (6) "access[ing] the cash drawer, when necessary (cash transactions)," (7) "getting the receipt and coupons from dispenser," and (8) "provid[ing] the cash, receipt, coupons to the customer." (Declaration of Steven L. Johnson ("Johnson Expert Report"), DNOL Ex. 5, pp. 7-9.) Dr. Johnson also identifies the following "variations" of "primary tasks" and tasks that are performed "less frequently:" (1) "filling reusable bags;" (2) "filling large bags;" (3) "scanning merchandise over the counter or 'bottom of basket;'" (4) "handling large, heavy or awkward items;" (5) "removing hangers from clothes;" (6) "disposal of hangers and folding clothes;" and (7) "completing paperwork and using applying security detacher." (DNOL Ex. 5, Expert Report of Dr. Steven Johnson, pp. 10-12.) Although Target ultimately disputes Dr. Johnson's conclusions regarding the frequency of tasks, Target accepts

1   no one would dispute that it is physically possible to place a seat of some description in the

2   checkstands, and that it is physically possible to perform some sub-set of cashiering duties from that

3   seat, no one—including Plaintiffs' expert—is proposing that it would be appropriate for someone

4   doing the full duties of a Target Cashier to do so.  And as demonstrated by the video, cashiering at

5   Target is a physical job which requires constant movement.  Simply put, the nature of the work of a

6   Target Cashier <u>requires standing</u>.[5]

7
8               **1.  Cashiers Must Scan and Bag Items of All Sizes and Often Must Lift Heavy
                      or Bulky Items or Walk Around the Checkstand to Hand Scan Items**

9              Target stores in California sell between approximately 60,000 and 125,000 independent

10  products.[6]  These items range in size from a pack of gum to large, heavy, and bulky furniture, with

11  items such as 40 lb. bags of dog food, tubs of cat litter and cases of soda falling in between.[7]

12  Because a Target transaction can range from the purchase of a single soft drink to dozens of varying

13  items, Target Cashiers must be able to work efficiently and safely with a vast inventory of items.[8]

14             When a transaction contains a heavy or bulky item, Cashiers are either required to lift the

15  item from the conveyor belt for scanning and/or bagging or, if the guest has left the item in their

16  shopping cart, to use the hand scan gun and walk around the checkstand to scan the item in-cart.[9]

17  Plaintiffs' expert ergonomist, Dr. Steven Johnson, acknowledges that "when a cashier is

18

19  his characterization that these are all tasks performed by a Target Cashier for the purposes of this motion.

20  [5] While the nature of the work of each Target Cashier must be analyzed on an individual basis in order to determine whether each Cashier was "aggrieved" during any particular "pay period" such that any penalties available under PAGA may be awarded, (Labor Code sec. 2699(f)(2)), the issue of whether the nature of the work of Target Cashiers reasonably

21  permits the use of seats generally is appropriate for determination in this summary judgment motion.  This is because Target Cashiers perform many of the same tasks across all stores and across time.  However, the frequency and duration

22  of these tasks, including manipulating bulky items, processing payment, using items within the checkstand, and moving to and from areas in and out of the checkstand, varies substantially from store to store and based on season, time of day,

23  percentage of shift spent in the checkstand, and other factors Target will enumerate in its opposition to Plaintiffs' motion for class certification.  In addition, factors unique to each Cashier, including size, weight, reach, strength  and other

24  measurements affect the safety of each task.

25  [6] Declaration of Julie Wegmiller ("Wegmiller Decl."), ¶ 15.

26  [7] Wegmiller Decl., ¶ 16; Marras Decl., ¶ 8, noting items weighing greater than or equal to 3 lbs. accounted for 88% of the items available at Target, and approximately 12% weighed more than 15 lbs. and further that large or extra large items (items greater than approximately 200 cubic inches) accounted for approximately 20% of the items available at Target; *see also* Marras Expert Report, DNOL Ex. 4, pp. 26-29.

27  [8] Wegmiller Decl., ¶ 16.

28  [9] Wegmiller Decl., ¶ 11; *see also,* "Cashier Training Guide," DNOL Ex. 6,  p. 24.  Target refers to visitors in its stores as "guests."

manipulating heavy, large, or awkward items," the task should <u>not</u> be performed from a seated posture.[10]  Consequently, each and every transaction that includes even one heavy or awkward item <u>requires standing</u>, and cannot be accomplished from a seated position.

### 2. Cashiers Are Required to Step Out from Behind Their Checkstand, Wait "In Aisle," and Greet Guests

Cashiers are not permitted to simply wait in their checkstands for guests to arrive unless they have a disability or medical condition that is being accommodated.[11]  If there is not a guest being checked out or approaching the checkstand, Cashiers are required to step out of their checkstand to invite guests to their lanes and encourage guests to avoid checkstands where guests are waiting.[12]  Indeed, Cashiers are instructed to make themselves visible and appear attentive and eager to serve guests.[13]  Murphy testified if she does not have a guest in her lane, she "stand[s] out just to see if there's anybody coming and pull them into my lane," meaning that she steps out of and around her checkstand to tell guests there is no wait and invite them into her lane.[14]  Perry testified it was one of her responsibilities to come out of the checkstand and let other guests who are in line know to come into her lane.[15]  Target has provided declarations from an additional 59 Cashiers, all of whom confirm that it is part of their job to step out from behind the checkstand, walk into the aisle, and greet guests or invite them to checkout.[16]  Clearly, these duties cannot be performed seated.

### 3. Cashiers Must Clean, "Zone," and Process Hangers, None of Which Can Be Accomplished While Seated

In addition to stepping out from behind their checkstand to greet and assist guests and

---

[10] Deposition of Dr. Steven Johnson ("Johnson Depo."), DNOL Ex. 12, p. 147:1-8; *see also,* Johnson Depo., DNOL Ex. 12, at pp. 95:8-96:15.

[11] Wegmiller Decl., ¶¶ 12, 18.

[12] Wegmiller Decl., ¶ 12; *see also,* "Cashier Training Guide," DNOL Ex. 6, p. i; Compendium of Target Cashier Declarations at Cashier Fact No. 2.  Because of the volume of declarations of Target Cashiers submitted in support of Target's Motion, Target has compiled the declarations in a "Compendium of Target Cashier Declarations" for the Court's convenience.  The Compendium is organized alphabetically by Cashier last name, and includes an index of "Facts Supported by Cashier Declarations" indicating which Cashier declarations have been submitted in support of which enumerated fact.

[13] Wegmiller Decl., ¶ 12; *see also,* "Cashier Training Guide," DNOL Ex. 6, p. i.

[14] Deposition of Danyell Murphy ("Murphy Depo."), DNOL Ex. 13, pp. 44:11-45:14.

[15] Deposition of Candi Perry ("Perry Depo."), DNOL Ex. 14, pp. 131:14-132:4.

[16] Compendium of Target Cashier Declarations at Cashier Fact No. 2.

process heavy or bulky items, Cashiers are responsible for a number of other duties that require standing.  First, Cashiers are responsible for cleaning the areas in and around their checkstands, including wiping up spills and using provided cleaning supplies to keep their checkstand neat.[17] Second, Cashiers must "zone" and merchandise the areas adjacent to their checkstands by straightening and replenishing gum and candy displays.[18]  Third, Cashiers must process clothing hangers.[19]  Murphy testified that she collects hangers in a bin in her checkstand, then when that bin is full, she collects either her own hangers or hangers from all lanes, walks to an unused express lane, and empties the hangers from her checkstand into a larger bin.[20]

When Cashiers have no guests to checkout and the above-listed duties are completed, Cashiers are required to ask their Team Lead for additional tasks to perform throughout the store.[21] These tasks might include assisting in another department in which the Cashier is cross-trained, restocking merchandise throughout the store, or sorting and returning items left at the checkstands.[22]

As Murphy acknowledged, Target Cashiers are expected to be constantly productive.[23]  This expectation is further confirmed by Perry and the declarations of 127 Target Cashiers, who have testified there is virtually no time during which Target Cashiers are sitting idle with nothing to do.[24] It is <u>undisputed</u> that the tasks that take Target Cashiers out of their checklanes (such as stepping into the aisle to greet guests, walking around or through the checkstand with a hand scanner to scan items left in guest carts, assisting guests, merchandising, cleaning the checkstand and surrounding area, returning hangers or go-backs to designated areas, to name a few) <u>require standing</u>.

---

[17] Wegmiller Decl., ¶ 13; see also, Murphy Depo., DNOL Ex. 13, pp. 48:2-49:18; Perry Depo., DNOL Ex. 14, p. 142:1-2; Compendium of Target Cashier Declarations at Cashier Fact No. 3.

[18] Wegmiller Decl., ¶ 13; see also, Murphy Depo., DNOL Ex. 13, pp. 48:2-49:18; Perry Depo., DNOL Ex. 14, p. 141:23-25; Compendium of Target Cashier Declarations at Cashier Fact No. 4.

[19] Wegmiller Decl., ¶ 13; see also, Murphy Depo., DNOL Ex. 13, pp. 48:2-49:18; Perry Depo., DNOL Ex. 14, pp. 84:15-86:5; Compendium of Target Cashier Declarations at Cashier Fact No. 5.

[20] Murphy Depo., DNOL Ex. 13, p. 48:6-20.

[21] Wegmiller Decl., ¶ 14; *see also,* Perry Depo., DNOL Ex. 14, pp. 136:19-137:6, 142:5-10; Compendium of Target Cashier Declarations at Fact No. 6.

[22] Wegmiller Decl., ¶ 14.

[23] Murphy Depo., DNOL Ex. 13, p. 47:7-23.

[24] Perry Depo., DNOL Ex. 14, p. 144:4-19; Compendium of Target Cashier Declarations at Cashier Fact No. 7.

### B.     Cashiers Cannot Perform Their Required Duties When Provided Seats

Target does not typically permit Cashiers to sit while performing their duties.  However, where necessary to accommodate an employee's disability or medical condition, on a case-by-case basis, Target modifies the duties of a position to permit the use of a seat.[25]  Cashiers who are accommodated are generally relieved of certain job requirements because Cashiers cannot perform even the essential functions of their position seated.

Indeed, Murphy testified that when provided a seat as an accommodation, her duties were modified.[26]  She testified that when there was not a guest in her checklane, she simply sat on her stool.  *Id.* at p.111:6-11.  As outlined above, this is time a Cashier ordinarily would have been greeting or assisting guests, merchandising, zoning, cleaning, or performing other tasks as assigned.  Indeed, Murphy testified that she sat between checking out guests "because that was the only time I could be able to sit for a time that I wouldn't have to do any movement."  *Id*.  Murphy admits that Cashiers—when performing all of the duties required—are in constant motion.

Murphy specifically testified that she could ***not*** perform the following core tasks required of Cashiers when seated:

- Bagging items as heavy as a gallon of milk.  Murphy testified she would "have the guest pick up that item."  *Id.* at p. 112:11-21; *see e.g.*, DNOL Ex. 2, at timestamp 3:34-4:03; 6:14-6:18; 12:05-12:09.
- Using the hand scanner to scan items in guest carts.  Murphy testified she would have the guest "actually scan it themselves."  *Id.* at p. 113:4-23; *see e.g.*, DNOL Ex. 2, at timestamp 7:58-8:19; 9:53-10:02; 14:39-14:51.
- Scanning or moving heavy items like shelves, dog food, or cat litter.  Murphy would ask guests to place these items back in their carts themselves.  *Id.* at pp. 114:18-115:25; *see e.g.*, DNOL Ex. 2, at timestamp 3:08-3:19; 3:37-4:03; 7:58-8:19; 15:29-15:43.
- Placing items on the takeaway counter.  *Id.* at p. 117:1-11; *see e.g.*, DNOL Ex. 2, at timestamp 3:06-3:19; 3:56-4:03; 4:51-4:56; 12:30-13:33; 14:39-14:51.
- Calling guests into her area.  *Id.* at p. 119:8-13; *see e.g.*, DNOL Ex. 2, at timestamp 01:11-01:37; 15:09-15:26.
- Merchandising her area.  *Id.* at p. 119:14-19; *see e.g.*, DNOL Ex. 2, at timestamp 15:09-15:26.
- Taking items like hand baskets to the front of the store.  *Id.* at p. 119:20-24; *see e.g.*, DNOL Ex. 2, at timestamp 00:00-00:12.

---

[25] Wegmiller Decl., ¶ 18.

[26] Murphy Depo, DNOL Ex. 13, pp. 119:8-120:8.

- Any functions of her Cashier position that required her to leave her checkstand. *Id.* at p. 120:5-8; *see e.g.*, DNOL Ex. 2, at timestamp 2:13-2:25.

Similarly, Perry was provided a seat as an accommodation. She testified that when cashiering from a seated position, she was unable to scan large items in carts or complete the point-of-service portion of the transaction, and would have to get up to perform those tasks.[27] Plaintiffs' testimony is confirmed by numerous Cashiers who have been accommodated with a seat. [28] Almost universally, these "seated Cashiers" confirm their job was made more difficult, if not impossible, from a seat.[29]

## C.   **Target's Approach to Checkout Is Consistent With the Target Brand, Including a "Fast, Fun and Friendly" Guest Experience**

Target's "Store Mission" is to "drive sales profitably by delivering a Target brand shopping experience for our guests."[30] The Target brand shopping experience is defined by Target's "Fast, Fun and Friendly" guest service model. [31] Team Members, including Cashiers, are expected to fulfill Target's mission in numerous ways.[32] It is Target's goal that "Fast, Fun and Friendly" service, along with a diverse product mix and commitment to clean, easy-to-navigate stores, will create an overall impression of Target as a fast-paced environment in which guests can expect quick, responsive,

---

[27] Perry Depo., DNOL Ex. 14, pp. 121:6-23, 162:7-163:21. Without belaboring the point, Ms. Perry consistently received poor performance reviews during her tenure at Target. Ms. Perry acknowledges that one of the issues with her performance was her failure to meet Target's expectations for her position, including meeting speed expectations, keeping her checkstand and adjacent area clear of unwanted merchandise, zoning merchandise around the checkline, and stepping out in-aisle, and asking a Team Lead for additional tasks when guest traffic was slow. (*See e.g.*, Perry Depo., DNOL Ex. 14, pp. 88:18-90:17; 126:5-16; 129:20-132:16; 136:19-137:22.)

[28] Target anticipates Plaintiffs will argue because it fulfilled its obligations under the law and provided accommodations to some employees who had disabilities or medical conditions, that Target has somehow conceded that the "nature of the work" of a Target Cashier "reasonably permits the use of a seat." Quite the contrary, Target feels that the limitations met by Cashiers who were accommodated, including Plaintiffs, prove how much of the work of a Cashier cannot be done seated. In accommodating the disabilities and medical conditions of its Team Members, Target necessarily alters its expectations of performance of job duties and the accommodated employee necessarily performs an abbreviated or modified set of job duties during the period of accommodation. However, this is not equivalent to saying the relevant positions can be performed seated. Indeed, having Cashiers ask guests to perform many of the core cashiering functions, as Murphy testified she does, is not a sustainable business model. As will be discussed *infra*, Plaintiffs' own expert ergonomist, Dr. Steven Johnson, agrees that a seat in the current configuration is not a long-term solution.

[29] Compendium of Target Cashier Declarations at Cashier Fact No. 8.

[30] Wegmiller Decl., ¶ 4; see also, "Target Team Member Handbook," DNOL Ex. 7, p. 11. Target refers to its employees as "Team Members."

[31] Wegmiller Decl., ¶ 4; *see also*, "Target Team Member Handbook," DNOL Ex. 7, p. 11; "Cashier Core Role," DNOL Ex. 8, p. 1 (Target has attached its "Cashier Core Role" document for the years 2008-2011. Because each version is substantively similar, for ease of reference, all citations herein are to the 2010 version); Perry Depo., DNOL Ex. 14, p. 84:5-14.

[32] Wegmiller Decl., ¶ 5; "Target Team Member Handbook," DNOL Ex. 7, pp. 11-12. Target refers to its employees as "Team Members."

MEMORANDUM OF POINTS AND AUTHORITIES ISO TARGET'S MOTION FOR SUMMARY JUDGMENT

approachable, and accurate service.[33]  Part of creating this overall guest impression is having

Cashiers stand to provide a ready-to-serve image.[34]  Moreover, speed and ease in every part of the

guest experience is an integral part of the Target brand shopping experience.  *Id.*  Target's primary

expectation for all Cashiers is excellent customer service, including speed and ease of checkout.[35]

As pointed out in its Cashier Training Guide, Cashiers are the last—and sometimes only—

Team Member interaction a guest has, and thus are primarily responsible for the guest's impression

of Target.[36]  Because of the importance of their role in providing exceptional customer service,

Cashiers are trained to provide "Fast, Fun and Friendly" service to each and every guest.  *Id.*

Cashiers are expected to follow "1+1 everywhere" meaning there should never be more than one

guest being assisted and one guest in line before a Cashier calls for backup.[37]  To assist its Cashiers

in executing the "Fast, Fun and Friendly" guest service model, Target has gone to considerable

efforts to ensure that its scanning and bagging practices are efficient, credit card processors are as

fast as possible, and guests do not wait in line.[38]  Indeed, to ensure it is meeting its goals of creating

a shopping experience where guests can expect such service, Target tracks the speed of each guest

checkout, and gives Cashiers immediate feedback on their speed.[39]

Target's commitment to "Fast, Fun and Friendly" service is not in dispute and can be found

on its website and in its training materials.  It is undisputed that this theme permeates every aspect of

Target's Team Member interactions with Target's guests.  Murphy testified that "fast, fun and

friendly" is a "core value" at Target and that she had heard on many occasions that it was important

to be "fast, fun and friendly at Target," and that she was "supposed to present a positive, energetic,

---

[33] Wegmiller Decl., ¶ 6; *see also*, http://sites.target.com/site/en/company/page.jsp?contentId=WCMP04-031793, DNOL, Ex. 9: "Our fast, fun and friendly team works to make every Target shopping trip an exciting and enjoyable experience. Our team members are always ready to help guests find what they're looking for.  We pride ourselves on making sure the items guests want are in stock and the checkout process is fast."

[34] Wegmiller  Decl., ¶ 7.

[35] Wegmiller Decl., ¶ 8; *see also,* "Cashier Training Guide," DNOL Ex. 6, p. i; Murphy Depo., DNOL Ex. 13, pp. 39:17-40:18; Perry Depo., DNOL Ex. 14, p. 91:5-15; Compendium of Target Cashier Declarations at Cashier Fact No. 1.

[36] Wegmiller Decl., ¶ 8; *see also,* "Cashier Training Guide," DNOL Ex. 6, p. i.

[37] Wegmiller Decl., ¶5; *see also*, Murphy Depo., DNOL Ex. 13, pp. 44:11-45:3; Perry Depo., DNOL Ex. 14, pp. 131:14-132:16.

[38] Wegmiller Decl., ¶ 10.

[39] Wegmiller Decl., ¶ 10; *see also*, "Cashier Training Guide," DNOL Ex. 6, p. 25; Murphy Depo., DNOL Ex. 13, p. 46:5-47:6; Perry Depo., DNOL Ex. 14, pp. 90:18-91:15.

1    helpful image on behalf of Target."[40]  Perry testified similarly.[41]

2         **D.      Target's Checkstands are Thoughtfully Designed and Meet OSHA Guidelines**

3         Target's commitment to speed and efficiency for its guests is reflected in its checkstands,

4    which are carefully designed to: (1) allow Cashiers to perform all of their duties in the most effective

5    way possible, and (2) ensure the safety of Target's Cashiers.[42]  Target's front-end checkstands are

6    the result of a rigorous design process involving at least seven departments, including Operations,

7    Design, Technology Services, In-Store Marketing, Risk, and Asset Protection.  *Id*.  This process

8    typically lasts a minimum of 28 weeks and is subject to scrutiny at every stage, including at the

9    executive level.  *Id*.  Additionally, Target's in-house ergonomist is involved at every stage.  *Id*.

10        Target's expectation that its Cashiers will stand is not arbitrary.  Target has considered—and

11   rejected as inefficient and unsafe—the idea of a seated Cashier.  Target conducted visual

12   observations in 2006 at the European retailer ALDI when it first opened stores in the United States

13   and introduced seated cashiers.[43]  Those observations showed that ALDI had very limited product

14   mix (mostly grocery),[44] and very different service and staffing levels (for instance, its customers, not

15   its cashiers, bag groceries).  Target concluded that the ALDI model was not feasible given the very

16   different nature of the work of its Cashiers.[45]  Target was and remains unaware of any retailer in the

17   United States which provides seats for its Cashiers <u>and</u> which requires its Cashiers to perform the

18   many duties which Target Cashiers are expected to undertake.  *Id*.  Separately, as part of its periodic

19   prototype review, Target also considered and rejected incorporating a seat in the checkstand, because

20   it concluded the job of a Target Cashier could not appropriately be done seated.[46]

21        As part of its commitment to Team Member safety, Target's checkstands are designed to

22   meet the current guidelines set forth by OSHA for retail grocery stores.[47]  Indeed, in reviewing

23

24   [40] Murphy Depo., DNOL Ex. 13, pp. 39:17-40:18.

     [41] Perry Depo., DNOL Ex. 14, pp. 84:5-14; 140:19-142:10.

25   [42] Knoll Decl., ¶ 4.

     [43] Wegmiller Depo., DNOL Ex. 15, pp. 83:17-89:23, 90:6-92:24; *see also,* Wegmiller Decl., ¶ 17.

26   [44] *See* Footnote 7, *supra*, for a comparison of Target's product mix.

     [45] Wegmiller Depo., DNOL Ex. 15, pp. 83:17-89:23, 90:6-92:24; *see also,* Wegmiller Decl., ¶ 17.

27   [46] Deposition of Jim Gustafson, DNOL Ex. 16, pp. 14:8-18; 16:19-17:19; 19:8-20:2; 25:17-27:19; Deposition of Erich
     Selvig, DNOL Ex. 17, pp. 24:13-27:21.

28   [47] Deposition of Deborah Bowles, DNOL Ex. 20, pp. 42:15-23; 158:12-165:2 (discussing, *inter alia*, how Target

1   OSHA's guidelines for "Front End (Checkout, Bagging, Carryout)" during his deposition, Dr.

2   Johnson testified that Target has done a "good job" of complying with the OSHA guidelines.[48]

3   Target has never been cited by OSHA relating to its operations at the checkout counter or for

4   performance of the duties of its Cashiers.[49]

5       **E.**    **Target's Generous Break Schedule Permits Target Cashiers to Use Seats**

6         Target provides meal and rest periods in excess of that required by California law.[50]  For

7   most Team Members, this policy means they do not work more than two hours without taking a meal

8   or rest period.  *Id.*  Murphy testified that Target is "very strict" regarding meal and rest breaks and

9   that she takes a break about every two hours.[51]  Perry testified consistently with Murphy, stating that

10  she would typically have a break every two hours; for four-hour shifts she would get a fifteen minute

11  break, and for shifts over four hours, she would get an additional lunch break.[52]  Murphy testified

12  that she has only had trouble finding a seat in the breakroom "a couple times" but that there were

13  other places to sit on those occasions.[53]  Murphy's testimony is confirmed by numerous Cashiers, all

14  of whom state they have never had trouble finding an available seat while on break.[54]

15

---

16  implemented a footrest, toe space, good quality anti-fatigue mats, a long scanner cord, a lean paid and designed the
    checkstand so that the Cashier's work could be done within preferred work zone).  A true and correct copy of the OSHA

17  "Guidelines for Retail Grocery Stores: Ergonomics for the Prevention of Musculoskeletal Disorders" is attached to
    DNOL as Ex. 10.

18  [48] Johnson Depo., DNOL Ex. 12, p. 209:14-18; *see* OSHA "Guidelines for Retail Grocery Stores," DNOL Ex. 10, pp.
    17-18 and p. 3 which states that the Guidelines are intended for retail grocery stores, combined full-line supermarket and

19  discount merchandisers including warehouse retail establishments and state that operations in retail involving similar
    tasks or operations may find the guidelines instructive.  *See also,* Johnson Depo., DNOL Ex. 12, pp. 201:22-209:22.  It is

20  significant to note that the only aspect of OSHA's guidelines Dr. Johnson testified he believes Target has not complied
    with is the provision of a "footrest." (Johnson Depo., DNOL Ex. 12, pp. 205:15-22.)  However, Target does in fact

21  provide a footrest, and Murphy and Perry testified they use the foot rest.  (Knoll Depo., DNOL Ex. 19, pp. 252:18-253:2;
    Murphy Depo., DNOL Ex. 13, p. 72:4-7; Perry Depo., DNOL Ex. 14, p. 168:12-16.)  While Johnson also testified he

22  was not sure whether Target provided a "checkstand designed with an adjustable sit/stand or lumbar support against
    which cashiers can lean," (Johnson Depo, DNOL Ex. 12, p. 202:21-203:3) he testified he does not understand what the
    OSHA guidelines are calling for in stating that retailers should "consider using" such a "sit/stand lumbar support."

23  (Johnson Depo., DNOL Ex. 12, pp. 203:4-205:7.)

24  [49] Deposition of Jim Nelson ("Nelson Depo"), DNOL Ex. 18, pp. 26:22-27:21.

25  [50] For example, Target requires all Team Members working a shift of more than five hours to take a 45-minute meal
    period, rather than the 30-minute period prescribed by law.  Labor Code § 512.  Similarly, Target provides Team
    Members with regular 15-minute breaks, rather than the requisite 10-minute break.  Wegmiller Decl., ¶ 19; *see also,*

26  DNOL Ex. 7, "Team Member Handbook," pp. 25-26.

    [51] Murphy Depo., DNOL Ex. 13, pp. 41:18-42:3.

27  [52] Perry Depo., DNOL Ex. 14, pp. 49:4-12, 146:6-147:4.
    [53] Murphy Depo., DNOL Ex. 13, pp. 42:4-43:23.

28  [54] Compendium of Target Cashier Declarations at Cashier Fact No. 9.

---

### III.   LEGAL ARGUMENT

**A.   Wage Order No. 7-2001, Section 14(A) and (B)**

Plaintiffs have brought this action under the California Labor Code Private Attorneys General Act of 2004 ("PAGA"), Labor Code §§ 2698 *et seq.*, seeking solely civil penalties against Target for allegedly violating Labor Code section 1198 which makes it illegal to employ a person under conditions of labor fixed by the IWC.  The IWC promulgates "Wage Orders" which prescribe working conditions for various industries.  Wage Order No. 7-2001, which is applicable to the mercantile industry, contains provisions regulating working hours, minimum wages, and other matters, including seating.  Cal. Code Regs., tit. 8 sec 11070.  Plaintiffs contend Wage Order No. 7-2001, Section 14(A) requires Target to provide its Cashiers "suitable seats."  Section 14 of the Wage Order provides, in its entirety as follows:

> (A) All working employees shall be provided with suitable seats when the *nature of the work* reasonably permits the use of seats.
>
> (B) When employees are not engaged in the active duties of their employment and the *nature of the work* requires standing, an adequate number of suitable seats shall be placed in reasonable proximity to the work area and employees shall be permitted to use such seats when it does not interfere with the performance of their duties.  Wage Order No. 7-2001 (emphasis added).[55]

#### 1.   Subsections (A) and (B) Are Mutually Exclusive

Wage Orders are "'quasi-legislative regulations' that must be construed 'in accordance with the ordinary principles of statutory interpretation.'"  *Campbell v. PricewaterhouseCoopers, LLP,*

---

[55] This action is one of more than 30 cases that have been filed in the last several years across California, many by the same law firms representing Murphy and Perry, against major retailers and other defendants alleging a violation of the PAGA for an alleged failure to provide seats.  In addition to *Kilby*, this new trend in wage and hour litigation has resulted in a number of federal district court opinions addressing motions to dismiss, for class certification and summary judgment.  *See, e.g., Currie-White v. Blockbuster, Inc.*,  2009 U.S.Dist. LEXIS 68438 (N.D.Cal.) (dismissing action without prejudice for failure to plead sufficient facts); *Green v. Bank of America*, 2011 U.S.Dist. LEXIS 152745 (C.D. Cal.) (dismissing action with prejudice as "defendants' only obligation was to make seats available to employees to the extent they want them or request them... And plaintiffs have not alleged any facts to suggest they ever requested a seat."); *Kilby v. CVS Pharmacy, Inc.*, 2012 U.S. Dist. LEXIS 47855, *19 (S.D.Cal.) (denying class certification as "Plaintiff has not shown the common questions she asserts are capable of common resolution."); and *Garvey v. KMart Corp.*, 2012 U.S.Dist. LEXIS 51707, *8-12 (denying summary judgment as the evidence, including expert testimony by the same expert Plaintiffs advance in this case, was disputed as to whether job could be performed seated).

642 F.3d 820, 825 (9th Cir. 2011) (citations omitted); *see also Kilby, supra,* 2012 U.S. Dist. LEXIS at *10-12 (discussing principles of statutory interpretation as applied to Section 14).  Under those principles, courts must first look to the text of the statute, and if its plain meaning is unambiguous, that meaning governs.  *Campbell*, 642 F.2d at 826.  The *Kilby* court applied these principles to Section 14:

> Subsection (A) provides: 'All working employees shall be provided with suitable seats when the nature of the work reasonably permits the use of seats.'  The Ninth Circuit recently held in Campbell v. PricewaterhouseCoopers, supra, that the IWC's use of 'highly inclusive' language such as the word 'all' 'frames its application in terms of individual employees,' giving effect to the IWC's intention that wage orders regulate the working conditions of all employees, while being enforceable against employers for a single violation against any individual employee.  However, while it begins with 'highly inclusive' language, subsection (A) is not unqualified.  Later language within the text of the subsection serves to limit its application to only those instances when 'the nature of the work reasonably permits the use of seats.'  This qualification means that no individual employee is excluded from its provision—unless that employee is performing a certain type of job, i.e., a job that cannot be performed while seated.  This is a relatively straightforward idea.  *Kilby*, 2012 U.S. Dist. LEXIS at *11-12.

The *Kilby* court continued:

> In direct contrast to subsection (A), subsection (B) is limited to only those instances when 'the nature of the work requires standing.'  Subsection (B) does not contain 'highly inclusive' language such as 'all' employees.  It conditions the use of a seat on the employee 'not being engaged in the active duties of their employment.'  Later language further limits an employee's use of a seat to only those times 'when it does not interfere with the performance of their duties.'  Thus, while subsection (A) concerns only the needs of the employee, subsection (B) attempts to strike a balance between the employee's needs and the requirements of the job.  *Id*. at *12.

As a final point, the court concluded that Section 14 contains no conjunction or disjunctive between subsections (A) and (B), and each subsection is comprised of a single sentence.  Citing to *Jama v. Immigration & Customs Enforcement*, 543 U.S. 335, 125 S.Ct. 694, 701 (1995), the *Kilby* court held:

> When both subsections are given full and independent effect, Section 14 establishes a dichotomous approach for employers to follow, based on the 'nature of the work' involved.  The subsections are mutually exclusive.  *Id*. at *13.

1   Thus, subsections (A) and (B) should be read independently, and an employee can only be protected

2   by one subsection, not both simultaneously.

3      **2.  An Analysis of the "Nature of the Work" Must Necessarily Consider the Entire Job**

4

5      Wage Order No. 7-2001, Section (14) provides no detail regarding the meaning of the term

6   "nature of the work."  We anticipate Plaintiffs will argue, as they have done in other seats cases, that

7   the phrase "nature of the work" requires a piecemeal analysis of each task and sub-task performed by

8   the Cashier and mandates the provision of a seat if any part of any task can be performed in a seat—

9   no matter how small, intermittent, or disjointed the task is from the job as a whole.  For example, if a

10  Cashier can scan and bag a pen from a seat then a seat should be provided.  Plaintiffs' impractical

11  parsing of one essential function—scanning—into further sub-parts—scanning light vs. heavy

12  items—lacks any authority or contextual support in the Wage Order.  Indeed, such a strained reading

13  is contrary to the majority of existing authority which indicates that the duties of the entire job must

14  be considered.[56]

15     First, a plain reading of the word "nature" requires a more comprehensive view of the job.

16  As defined in Webster's II New Riverside University Dictionary, "nature" means the "essential

17  characteristics and qualities" of a thing.  Next, and more importantly, Plaintiffs' interpretation of

18  subsection 14(A) would render subsection 14(B) virtually meaningless as it becomes difficult to

19  imagine any job where no portion of the job could be done in a seat.  Under such a tortured reading,

20  subsection 14(B) would never be invoked as there would never be a job that "required standing," for

21  every finite task.  Interpreting the phrase "nature of the work" in a manner other than viewing the job

22  in its entirety would lead to an absurd result and courts do not read statutes or regulations to create

23  absurd results.  *See Wasatch Prop. Mgmt. v. Degrate,* 35 Cal.4th 1111, 1122 (2005); *Woods v.*

24  *Young,* 53 Cal.3d 315, 323 (1991).

25     This conclusion is consistent with *Hamilton v. San Francisco Hilton, Inc.*, San Francisco

26

27  [56] The trial court in *Hall v. Rite Aid Corp.*, San Diego Superior Court Case No. 37-2009-00087938-CU-OE-CTL, did "reject" the argument that "'the nature of the work' refers to the job 'as a whole,'" but appears not to have undertaken the in-depth analysis of Section 14 engaged in by the *Kilby* court.  Target submits that the *Kilby* court's analysis leads to the correct result.

28

Super. Ct. No. 04-431310 (June 29, 2005) at p. 5[57] and the court's holding in *Kilby*: "[t]he IWC

clearly felt it necessary to delineate between the overall 'nature of the work' an employee does and

the 'duties' that work may encompass.  Thus, Plaintiff's assertion that the Court should interpret the

'nature of the work' in this case to be limited in scope to the single duty of operating a cash register

is without merit.  Rather, operating a cash register is more properly considered a 'duty' of

employment as a Clerk/Cashier."  *Kilby*, 2012 U.S. Dist., LEXIS at *14.  Thus, the *Kilby* court held:

> Based on the language and structure of Section 14, the 'nature of the
> work' performed by an employee must be considered in light of that
> individual's entire range of assigned duties in order to determine whether
> the work permits the use of a seat or requires standing.  *Id.*

Similarly, the DLSE and IWC *explicitly* rejected an interpretation of the "nature of the work"

of mercantile salespersons to provide seats.  The DLSE opined that the "nature of the work" of

salespersons required them to "be in a position to  greet customers, move freely throughout the store

to answer questions and assist customers in their purchases" and "*was not intended to cover those*

*positions where the duties require employees to be on their feet, such as salespersons in the*

*mercantile industry.*"[58]  The DLSE pointed out that California's mandatory rest periods were

intended to provide respite for employees who have to stand for long periods of time and employees

who have to perform "relatively laborious work."  This conclusion was affirmed by the IWC, "[t]he

nature of the work for salespersons is such that it requires them to be mobile and …, to be in a

position to greet customers and move freely throughout the store."[59]  While these positions are not

identical to the Cashier position at Target, the duties required of the salespersons, namely being in a

position to greet and assist customers, are sufficiently similar to offer guidance on the subject here.

---

[57] A true and correct copy of the *Hamilton v. San Francisco Hilton, Inc.*, San Francisco Super. Ct. No. 04-431310 (June 29, 2005) order granting Defendant's motion for summary judgment is attached to Defendant's Request for Judicial Notice ("RJN") as Exhibit A.  The *Hamilton* court rejected a reading grafting a proviso into Section 14(A) that if any part of a job can be performed while seated, then a seat must be provided for that part of the job, even where other parts of the job require standing, "[i]f standing is required for part or all of a job, Section A does not apply and the employer must comply with Section B."  *Hamilton* at p. 5.

[58] *See* December 5, 1986 letter from Albert J. Reyff, Chief Deputy Labor Commissioner at the California Department of Industrial Relations, Division of Labor Standards Enforcement, to Ms. Jacqueline L. Soufi regarding Industrial Welfare Commission Order 4-80, Section 14, Seats, attached to Defendant's RJN as Exhibit B.

[59] *See* January 18, 1987 letter from Karla M. Yates, Executive Officer at the California Department of Industrial Relations, Industrial Welfare Commission, to Ms. Jacqueline L. Soufi regarding Industrial Welfare Commission Order 7-80, Section 14, Seats, attached to Defendant's RJN as Exhibit C.

The opinions of the IWC and DLSE, while not binding on this Court, are entitled to deference and consideration in interpreting regulatory guidance.[60]  Based on these authorities and the language of the statute, this Court must reject Plaintiffs' contention that the 'nature of the work' can be defined by any one of the numerous tasks a Cashier is expected to perform and instead requires an analysis of the entire job, and when viewed in that manner clearly requires standing.

**B.    The "Nature of the Work" of a Target Cashier Requires Standing and/or Does Not Reasonably Permit the Use of a Seat**

Plaintiffs have only brought suit under Section 14(A).  (First Amended Complaint, ¶¶ 6, 10.)  Thus, in order to prevail in this action, Plaintiffs must establish that the "nature of the work" does not require standing (otherwise Section 14(B) would apply), _and_ that the "nature of the work reasonably permits the use of seats."  Plaintiffs are unable to meet their burden, however, because the "nature of the work" of a Target Cashier: (1) requires standing; and (2) does not reasonably permit the use of a seat.  Therefore, summary judgment is appropriate.

**1.    Seated Cashiers Are Inconsistent With Target's "Fast, Fun and Friendly" Guest Service Brand Image**

Target's brand image, including its "Fast, Fun and Friendly" approach to customer service, is based on a simple idea—guests want a high-end experience with competitive prices and excellent selection.  Target's high customer service standards, including fast checkout, do not permit the use of a seat.  The _Kilby_ court's recent finding that "courts should consider an employer's 'business judgment' when attempting to discern the nature of an employee's work" is consistent with other case law, as well as analogous authority under the Americans with Disability Act ("ADA").

In _Hamilton v. San Francisco Hilton, Inc._, San Francisco Super. Ct. No. 04-431310 (June 29, 2005) (_See_ RJN, Exhibit A) front desk clerks employed by the San Francisco Hilton filed a

---

[60] As explained by the California Supreme Court in its April 12, 2012 decision in _Brinker Restaurant Corp. v. Superior Court_, 53 Cal. 4th 1004, 1029, (2012), fn. 11, "The DLSE 'is the state agency empowered to enforce California's labor laws, including IWC wage orders.'"  (_Morillion v. Royal Packing Co._, 22 Cal.4th 575, 581 (2000).) The DLSE's opinion letters, " ' "'while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.' ' " ' (_Seymore v. Metson Marine, Inc._, 194 Cal.App.4th 361 (2011), fn. 5; _see Morillion_, at p. 584 [relying on DLSE opinion letters to inform its interpretation of the IWC's wage orders].)"

1   complaint essentially identical to that filed in this matter, alleging they were entitled to PAGA

2   penalties based upon the fact that they were not provided seats even though the nature of their work

3   as front desk clerks, or guest service agents ("GSAs") reasonably permitted the use of seats.

4   Defendant argued that the use of seats would be inconsistent with the business image the hotel

5   wished to project, noting that a "standing GSA projects a sense of anticipation, attentiveness and

6   readiness to serve" whereas "a sitting GSA is less welcoming, less empathetic, less responsive, less

7   organized and less productive than one who is standing."  (RJN, Exhibit A, at p.1.)  The Court

8   granted summary judgment on multiple grounds, taking the opportunity to reiterate that

9   "[Defendant] is lawfully permitted to make a business decision, relying on its rational business

10  judgment, to require GSAs to stand while at the front desk."  *Id*. at 4-5.

11         Similarly, the regulations promulgated under the ADA give due weight to the employer's

12  definition of the essential functions of the job and how the job is actually performed.  *See* 29 C.F.R.

13  § 1630.2(n)(2)(i) ("A job function may be considered essential … because the reason the position

14  exists is to perform that function…."); *id.* at § 1630.2(n)(3) ("Evidence of whether a particular

15  function is essential includes, but is not limited to: (i) the employer's judgment as to which functions

16  are essential; (ii) Written job descriptions prepared before advertising or interviewing applicants for

17  the job; …." ; *see also D'Amico v. City of New York*, 132 F.3d 145, 151 (2d Cir. 1998) (under

18  Rehabilitation Act, "[a] court must give considerable deference to an employer's judgment regarding

19  what functions are essential for service in a  particular position"); *see also* Cal. Gov't Code §

20  12926(f)(2) ("evidence of whether a particular function is essential includes, …, the following:  (A)

21  The employer's judgment as to which functions are essential…")

22         Standing is consistent with Target's brand image[61] and Target is entitled to include standing

23  in its expectations for the Cashier position.  Target's Cashiers themselves believe that when they can

24  make eye contact and seem readily able to move about they are perceived as friendlier, and more

25  approachable, responsive and available than if they are seated.[62]  While Target is always willing to

26  accommodate a Cashier with a disability or medical condition, it believes that a policy mandating

27

28  _____

[61] Wegmiller Decl., ¶ 8.

[62] *See* Compendium of Target Cashier Declarations at Cashier Fact No. 10.

1   seated work would be inconsistent with the nature of the work of a "Fast, Fun and Friendly" Target

2   Cashier.[63]  Target's is entitled to define the expectations for its Cashiers and its business judgment

3   should be considered in determining the nature of the Cashier's work and whether it reasonably

4   permits the use of a seat.

5           **2.**       **Plaintiffs' Expert Ergonomist Admits the Duties of a Target Cashier**

6                   **Require Standing and Cannot Be Performed Seated and That He Cannot Identify a Feasible Seated Alternative**

7           As an initial matter, it should be noted that both Plaintiffs and Target have retained

8   ergonomists to evaluate the nature of a Cashier's work.  Instead of providing an ultimate opinion on

9   whether the "nature of the work" reasonably permits the use of a seat, Plaintiffs' expert, Dr. Johnson,

10  testified regarding whether the work <u>can be changed</u> in a way that allows some tasks to be done

11  seated.  Thus, Dr. Johnson sought "to evaluate the feasibility of providing the cashiers with the

12  opportunity to sit and reduce the effort, fatigue and potential discomfort to their feet, legs and

13  back."[64]  To that end, Dr. Johnson asserts that "the question being addressed in [his] report is

14  whether *some of the tasks* performed at Target checklanes could be performed in a seated posture

15  *with modifications* to the current [checkstand] design."  *Id*. at p. 13, ¶ 32 (emphasis added).

16  However, this lawsuit is <u>not</u> about <u>redefining</u> the nature of the work of a Target Cashier to allow a

17  seat or whether if Target completely redesigned and rebuilt all of its checkstands, it would permit

18  Target Cashiers to do some of their tasks seated.  Instead, this lawsuit is about whether the job of a

19  Target Cashier, with all of its attendant duties, (1) requires standing, and/or (2) reasonably permits

20  the use of a seat.  With this proper focus, it is clear that Section 14(A) does not apply and summary

21  judgment is appropriate because Plaintiffs' expert ergonomist <u>agrees</u> (1) that the Target Cashier job

22  requires standing, and (2) as configured, or even if re-configured, Target Cashiers cannot perform

23  their jobs seated.

24            **a.**      **Dr. Johnson Agrees Cashiers Cannot Perform Their Duties Seated Within the Current Checkstand Configuration**

25          Dr. Johnson testified that if he was consulting with Target about whether to put a seat in the

26  current checkstands and allow Cashiers to do the job in a seated position, he "would <u>not</u> recommend

27

28  

---

[63] Wegmiller Decl., ¶ 8.
[64] Johnson Expert Report, DNOL Ex. 5, p. 12, ¶ 29.

that."[65]  Dr. Johnson testified that this would increase risk of injury and would be inefficient.  *Id.* at pp. 59:10-15, 61:17-62:9.  Specifically, Dr. Johnson noted that the following essential cashiering duties should not be performed from a seated position:

- Receiving items from the conveyor belt;
- Scanning items by moving them across the scanner or with the hand scanner; and
- Moving heavy or bulky items.  *Id.* at p. 57:2-60:16, 96:6-15.

Dr. Johnson's report reinforces this testimony and concludes that the tasks performed by a Target Cashier could be performed from a seated posture <u>only with modifications to the current checkstand configuration</u>.[66]  It is therefore undisputed that as its checkstands are currently configured, Target Cashiers' duties must be done standing.[67]

> **b.     Dr. Johnson Proposes a Hypothetical Checkstand Redesign But Agrees That Even If Implemented, Cashiers Must Stand to Perform Key Duties**

The bulk of Dr. Johnson's opinion is devoted to proposing a complete hypothetical redesign of Target's OSHA-compliant checkstands to allow for a seat during those times when a Cashier may choose to sit. [68]  To that end, Dr. Johnson recommends that Target design, build, and install "a checklane that can accommodate a standing cashier while providing a seated posture, at the cashier's discretion, to reduce the effort, fatigue and discomfort of the feet, legs and lower back associated with prolonged standing."[69]  Dr. Johnson states, "It is important to note that [my] recommendation is not a 'sit-only' workstation design, but a 'sit or stand' alternative."[70]  Dr. Johnson concludes that "[t]o perform a task for which sitting is not appropriate or if the frequency of standing dictates, the cashier would stand.  In addition, to the extent that a cashier experiences fatigue or discomfort in the arm and shoulders using the seated posture, they could stand and perform the tasks."[71]

---

[65] Johnson Depo., DNOL Ex. 12, 55:1-6 (emphasis added).

[66] Johnson Expert Report, DNOL Ex. 5, pp. 5, ¶20; 13, ¶32; pp. 20-49.

[67] *See* Johnson Expert Report, pp. 5, 13, DNOL Ex. 5; *see also*, Johnson Depo., DNOL Ex. 12, pp. 55:1-6; 95:8-96:15; 147:1-8, *see also* pp. 4-6 *supra*.

[68] *See* Johnson Depo., DNOL Ex. 12, pp. 201:22-209:22; Johnson Expert Report, DNOL Ex. 5, pp. 5, ¶20; 13, ¶32; pp. 20-49.

[69] Johnson Expert Report, DNOL Ex. 5, p. 35, ¶ 87.

[70] *Id.* at pp. 28-29, ¶ 73.  Dr. Johnson testified that to his knowledge, no such "sit or stand" design exists in a retail checkout environment.  (Johnson Depo., DNOL Ex. 12, pp. 273:22-274:19.)

[71] Johnson Expert Report pp. 28-29, ¶ 73, DNOL, Ex. 5.

Importantly, Dr. Johnson concludes that in any checkstand configuration "some of the tasks that occur at the checklane (e.g., handling large, heavy or awkward items and manipulating clothing) would probably be performed in a standing posture, even if a seat were provided." *Id.* at p. 12, ¶ 29. Indeed, Dr. Johnson reiterates that tasks such as "handling heavy or awkward items" and "scanning the bottom of the shopping cart…cannot reasonably be performed in a seated posture." *Id.* at p. 50, ¶ 121.[72]

Plaintiffs' concession that a seat cannot reasonably be used by Target Cashiers without an entire redesign of a checkstand that is already OSHA-compliant in itself demonstrates that the nature of the Cashiers' work does not *reasonably* permit the use of a seat.  However, even accepting Plaintiffs' expert's hypothetical redesign, Plaintiffs' claims fail because Plaintiffs' expert agrees certain core tasks of Target's Cashier position always require standing.

> **c.    Dr. Johnson's Hypothetical Checkstand Redesign Is Admittedly Untested and Simply Not Feasible**

Acknowledging that a standing cashier is the standard format used by retailers nationwide,[73] Dr. Johnson could provide no examples of any retailers in this country that provide a "sit or stand" option which he opines Target should implement.[74]   Thus, in order for Plaintiffs to prevail, the Wage Order would need to be found to require Target to redesign and rebuild its OSHA-compliant checkstands to a standard heretofore unknown in a retail environment based on the unsupported and completely speculative hope that an untested and unprecedented checkstand design might be beneficial.  There is no such requirement and one should not be read into the statutory language.

Furthermore, Dr. Johnson's opinion that some tasks of a Target Cashier can be done seated under a theoretical redesign is purely speculative.[75]  Dr. Johnson testified that *if* you could meet the objectives of creating an environment that allows for sitting without a loss of productivity *and* without increasing injuries, *then* he would recommend adding a seat.[76]  But he concedes his

---

[72] *See also,* Johnson Depo., DNOL Ex. 12, pp. 95:8-97:16.

[73] Johnson Depo., DNOL Ex. 12, p. 273:13-16; *see also,* Johnson Expert Report, p. 13, ¶32.

[74] Johnson Depo., DNOL Ex. 12, pp. 273:22-274:19.

[75] Target preserves all objections concerning the introduction of any testimony or evidence of a hypothetical checkstand design.

[76] Johnson Depo., DNOL Ex. 12, pp. 67:19-68:9.

1   proposed modifications are simply ideas; Dr. Johnson has not attempted to actually redesign Target's

2   checkstand to determine if the modifications are functional.  Quite the contrary, Dr. Johnson testified

3   he does not have experience building retail workstations, he has never designed a cashiering station,

4   and he did not even run his "redesign" by anyone who does designs or builds cashiering stations for

5   a living.  *Id*. at p. 157:2-12.  Further, Dr. Johnson concedes he has no evidence of the impact the

6   modifications he proposes would have on Cashier productivity or efficiency, nor does he know

7   whether such modifications would impact customer service.  *Id*. at pp. 97:9-98:10.  Moreover, Dr.

8   Johnson opines that only *with modifications* to the current checkstand design, could <u>some, but not</u>

9   <u>all,</u> of the duties of a Target Cashier be performed from a seat.[77]  Finally, and most significantly, Dr.

10  Johnson concedes that he does not know whether a redesign of the Cashier workstation would

11  provide a "net benefit" for Target Cashiers.[78]

12        It is *per se* unreasonable to require Target to redesign its checkstands to allow Cashiers to use

13  a seat to perform some of their job duties when there is no evidence that doing so while seated is

14  feasible or will benefit the Cashiers.  Under these circumstances, it cannot be found that the nature

15  of the work of a Target Cashier reasonably permits the use of a seat.

16              **3.    Target's Expert Ergonomist Agrees that Cashiering Cannot Be Done
                        Safely While Seated**
17

18        Dr. Johnson is not alone in his conclusion that Cashiers cannot perform their duties seated.

19  Not surprisingly, Target's in-house design team, in-house ergonomist, and retained expert in

20  biomechanics all agree that if Target Cashier's are forced to perform the duties of their job in any

21  configuration that includes seats, the result will be to increase the risk of injuries and harm to its

22  Cashiers.[79]  Target retained Dr. William Marras, a tenured professor at the Ohio State University, a

23  leader in the field of occupational ergonomics and the co-author of many of the leading texts, to

24  evaluate the design of its checkstands and whether the work performed by Cashiers could reasonably

25  be accomplished from a seated position.  Dr. Marras visited Target stores, viewed the checkstands in

26  _____
    [77] Johnson Depo., DNOL Ex. 12, p. 41:18-22.

27  [78] Johnson Depo., DNOL Ex. 12, pp. 92:21-93:6.

28  [79] Knoll Depo., DNOL Ex. 19, pp. 119:14-121:4; 122:4-20; 125:10-127:16; Marras Expert Report, DNOL Ex. 4, pp. 7-
    11; Deposition of Debra Bowles ("Bowles Depo."), DNOL Ex. 20, pp. 88:21:91:1; 94:9-18; 175:18-181:1.

place in the majority of Target's California stores, viewed extensive video to evaluate Cashiers at six stores, and performed a laboratory study regarding seated Cashiers using a Target checkstand.[80] Following this extensive review, Dr. Marras concluded that the duties of a Target Cashier could not be done safely while seated.[81]  Dr. Marras further concluded that Target's current checkstands are both efficient and ergonomically sound.  *Id*. at pp. 10-11.  Indeed, Dr. Marras observed that cashiering at Target requires a great deal of lifting, moving, reaching, bending, and virtually constant movement.  *Id*. at pp. 7-8.  These duties cannot be performed by a seated Cashier without significant twisting and bending risk.  *Id.* at pp. 7-8.  Further, Dr. Marras believes that if Target were to redesign its checkstands to include seats the result will be to increase the risk of injury to its Cashiers.[82]

## C. **Should This Court Decline to Grant Summary Judgment As to the Ultimate Legal Issue, Target Requests The Court Grant It an Exemption from Enforcement, Or, in the Alternative, Establish Certain Facts Are Not Genuinely in Dispute Pursuant to Rule 56(g)**

If this Court determines summary judgment is not appropriate as to the ultimate legal issue— whether or not the nature of the work of a Target Cashier requires standing or reasonably permits the use of a seat—this Court should exercise its authority under Wage Order No. 7-2001, Section 17, Exemptions, to grant Target an exemption from enforcement of Section 14.  Alternatively, the Court should determine that any potential violation of Section 14(A) by Target was indisputably inadvertent and as such shall be treated as established in the case.

### 1. **Target is Entitled to an Exemption under Section 17**

Target has asserted as an affirmative defense that it should be granted an exemption under Wage Order No. 7-2001, Section 17, Exemptions.  Section 17 provides, in pertinent part:

> **If**, in the opinion of the Division after due investigation, **it is found that the enforcement of any provision contained in** Section 7, Records; Section 12, Rest Periods; Section 13, Change Rooms and Resting Facilities; **Section 14, Seats**; Section 15, Temperature; or Section 16, Elevators, **would not materially affect the welfare and comfort of employees and would work an undue hardship on the employer, exemption may be made at the discretion of the Division**.

---

[80] Marras Decl., ¶ 4; Marras Expert Report, DNOL Ex. 4, pp. 3-4.

[81] *See generally,* Marras Expert Report, DNOL Ex. 4, (pp. 6-11 provides summary of opinions.)

[82] Marras Decl., ¶¶ 9-10; Marras Expert Report, pp. 7-8.

This Court has the power to grant an exemption under Section 17 because Plaintiffs have chosen to pursue this claim before the court as opposed to the DLSE.  As a result the court steps into the shoes of the enforcement agency for all purposes including completing the investigation required, assessing penalties (if any) or determining, based upon the investigation, whether an exemption is warranted.  *See* Section 2699(e)(1).[83]

Enforcement of Section 14 would not materially affect the welfare or comfort of employees.  Target's in-house design team, in-house ergonomist, and expert all agree if Target is forced to provide a seat to its Cashiers, it will result in increased risk of injury to its employees.[84]  Dr. Johnson acknowledges that the checkstand modifications posited are untested, and there is no evidence that the redesigned checkstand configurations would allow the same productivity, efficiency or customer service currently provided or in any way provide a "net benefit" to Cashiers.[85]

Moreover, enforcement of Section 14 would work an undue hardship on Target.  If Section 14 were enforced, Target would be required to not only somehow alter the nature of the work of a Target Cashier to alleviate the risks associated with a seated workstation (which Target contends is an impossible task given Target's product mix and brand image), but also simultaneously attempt to either redesign and re-build or modify every single checkstand in every California store to a design Plaintiffs' expert admits has never been tested and does not actually exist in any current retail environment.  *Id*. at p. 273:22-274:19.  Dr. Johnson testified that he did not consider any of the costs associated with making any of his proposed modifications to Target's checkstands, (*id*. at p. 182:6-11), presumably because there is no design on which to base a cost estimate.  While Target is also unable to estimate the cost of a non-existent redesign, Target employee Mitchell Knoll did estimate the cost of replacing all the California Target checkstands with the current model prototype (not a redesign) and that cost is in excess of $60 million.[86]  Developing a new and as-yet-unknown design

---

[83] Cal. Labor Code § 2699(e)(1) provides: "For purposes of this part, whenever the Labor and Workforce Development Agency, or any of its departments, divisions, commissions, boards, agencies, or employees, has discretion to assess a civil penalty, a court is authorized to exercise the same discretion, subject to the same limitations and conditions, to assess a civil penalty."

[84] Knoll Depo., DNOL Ex. 19, pp. 119:14-121:4; 122:4-20; 125:10-127:16; Marras Expert Report, DNOL Ex. 4, pp. 7-11; Bowles Depo., DNOL Ex. 20, pp. 88:21:91:1; 94:9-18; 175:18-181:1.

[85] Johnson Depo., DNOL Ex. 12, pp. 97:17-98:10: 92:21-93:6.

[86] Knoll Decl., ¶ 5.

1    would most likely cost more. *Id.*  Such a financial cost for enforcement of a provision that would not

2    materially affect the welfare of Target's Cashiers is not merited.  But more fundamentally, asking

3    Target to redesign and rebuild its checkstands to accommodate a seat when, at best, it is unknown if

4    the change will result in harm to its employees, is the greater hardship.  It is unreasonable to require

5    Target to undertake efforts it believes will negatively impact its workforce.  To that end, Target

6    respectfully requests that this Court grant the exemption.[87]

7              **2.        Alternatively, the Court Should Determine that Certain Facts Are Not**
                            **Genuinely in Dispute and Are Established in the Case**
8

9              This Court maintains the discretion to decline to award the statutory penalties in a PAGA

10   matter, and instead award a lesser amount if the statutory civil penalty would result in an unjust,

11   arbitrary, oppressive, or confiscatory award.  Cal. Lab. C. § 2699(e)(2).  While it is premature to

12   request that the Court reduce any potential penalties, because Target believes the award of penalties

13   in the default amounts would in fact be unjust, arbitrary, oppressive, and/or confiscatory, Target

14   requests the Court determine certain related facts are not genuinely in dispute and as such shall be

15   treated as established in the case, pursuant to Fed. R. Civ. P. 56(g).

16             For all of the reasons stated herein, including the testimony of Plaintiffs' expert, Target has

17   assumed its practice of employing standing Cashiers is consistent with the policy of the State of

18   California.  The "seats" provision upon which Plaintiffs rely has been enshrined within the

19   California Wage Orders for over a hundred years, yet Target is aware of no retailer ever having been

20   subject to an agency's citation for having retail cashiers stand.  In fact, it was the explicit position of

21   the agencies charged with the implementation of the Wage Order that the duties of retail salespeople

22   *did not* reasonably permit the use of a seat.  Moreover, as conceded by Dr. Johnson, Target's

23   checkstands comply with the guidelines set forth by OSHA, the agency charged with overseeing the

24   welfare of employees in the retail cashier environment, and Target has never been cited by OSHA

25   relating to its operations at the checkout counter or for performance of the duties of its Cashiers.[88]

26   ---
[87] Target notes that it has delayed posting the instant application for exemption pending direction from this Court on the
27   mechanics of such a posting in a judicial proceeding. *See* Wage Order No. 7-2001, Section 17 which provides, "[a] copy
     of the application shall be posted at the place of employment at the time the application is filed with the Division."
28   [88] Nelson Depo., DNOL Ex. 18, pp. 26:22-27:21.

This Court stands in the shoes of the IWC and DLSE in electing the amount of penalties to impose for failure to provide "suitable" seating.  *See* Cal. Labor Code § 2699(e)(1).  The undisputed evidence overwhelmingly demonstrates that any failure to comply with the law was based on a century of consistent, industry-wide practice and concern for employee safety.  Although Target firmly believes its checkstands comply with the law, any failure to do so under these circumstances is at worst inadvertence.  As a result, Target requests that this Court find the following facts are not genuinely in dispute pursuant to Rule 56(g): (1) Target's *current* checkstand configurations do not reasonably permit the use of a seat; (2) Target did not willfully violate Section 14; (3) any violation of Section 14 by Target was inadvertent; (4) enforcement of Section 14 would not materially affect the welfare or comfort of Target Cashiers; and (5) enforcement of Section 14 would work an undue hardship on Target.

## IV.   CONCLUSION

The nature of the work of a Target Cashier requires standing and therefore section 14(A) does not apply. Even when analyzed under Section 14(A), the comprehensive, undisputed evidence demonstrates that the nature of the work of a Target Cashier does not reasonably permit the use of a seat.  On that basis, Target respectfully requests that this Court grant its motion for summary judgment and dismiss Plaintiffs' First Amended Complaint in its entirety.  In the alternative, Target requests an exemption under Section 17, or a determination that the following facts are not genuinely in dispute and shall be treated as established in the case: (1) Target's current checkstand configurations do not reasonably permit the use of a seat; (2) Target did not willfully violate Section 14; (3) any violation of Section 14 by Target was inadvertent; (4) enforcement of Section 14 would not materially affect the welfare or comfort of Target Cashiers; and (5) enforcement of Section 14 would work an undue hardship on Target.

Dated:      June 13, 2012                          **WILSON TURNER KOSMO LLP**

By:      /s/ Claudette G. Wilson
CLAUDETTE G. WILSON
Attorneys for Defendant
TARGET CORPORATION